UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No.:  17-30067 (AMN) |
| MOISES N. GUEDES, | : | Chapter 7 |
| *Debtor* | : | |
| | : | |
| | : | |
| MOISES N. GUEDES, | : | Adv. Pro. No. 17-03011 (AMN) |
| *Plaintiff* | : | |
| v. | : | |
| | : | |
| RAYMOND DIGIORGIO AND | : | |
| FLORENCE DIGIORGIO | : | |
| *Defendants* | : | |
| | : | RE: ECF No. 56 |

## MEMORANDUM OF DECISION AND ORDER AFTER EVIDENTIARY HEARING

APPEARANCES

| | |
|---|---|
| *Counsel for the Plaintiff:* | *Counsel for the Defendants:* |
| *Russell G. Small* | *William Meehan* |
| *3715 Main Street, Suite 406* | *396 Danbury Road* |
| *Bridgeport, Connecticut 06606* | *Wilton, Connecticut, 06897* |

Before the Court is a motion brought by defendants Raymond and Florence DiGiorgio seeking an order enforcing an alleged, oral settlement agreement against plaintiff Moises N. Guedes.  AP-ECF No. 56 (the "Motion to Enforce").[1]  After an evidentiary hearing, I conclude the plaintiff did not meet his burden to demonstrate that his attorney at the time lacked authority to bind him to the alleged settlement terms, and, I also conclude the defendants met their burden to establish the existence of a binding settlement agreement.  My reasoning is explained in greater detail below.

---

[1]      Citations to the docket in Case No. 17-30067 are noted by "ECF No." Citations to the docket in Adversary Proceeding No. 17-03011 are noted by "AP-ECF No."

## I.    PROCEDURAL HISTORY AND FINDINGS OF FACT

### Procedural Background and Nature of the Proceedings

The plaintiff Moises Guedes commenced Chapter 7 bankruptcy case number 17-30067 (the "Main Case") with a voluntary bankruptcy petition filed on January 20, 2017 (the "Petition Date").  Mr. Tamis was the plaintiff's attorney at the time and filed the bankruptcy petition with the Court.  The plaintiff disclosed a one-ninth (1/9th) interest in real property known as 31 Evers Street, Bridgeport, Connecticut (the "Property") in his bankruptcy Schedule A/B, which he valued at either $16,885.00, or $17,056.00.  ECF No. 1, p.10.[2]  The plaintiff was not living at the Property on the Petition Date, and represented during a hearing held on September 19, 2017, that he had inherited it from his mother.  AP-ECF No. 12, 00:03:23 to 00:04:10[3].

On Schedule C, a list of statutory exemptions a debtor may claim in his bankruptcy case, the plaintiff asserted an exemption in the Property pursuant to 11 U.S.C.[4] § 522(d)(5) (known informally as the "wildcard exemption" that may be applied to any type of property) in the amount of $16,885.00.[5]  ECF No. 1, p. 16.  On Schedule E/F, a list of unsecured creditors, the plaintiff listed an undisputed, unsecured claim of defendants in the amount of $150,366.00.  ECF No. 1, p. 26.  In his Statement of

---

[2]    The Debtor's Schedule A/B includes two values for the Property on the same page.  ECF No. 1, p. 10.  The Court need not, and does not, make a specific valuation finding at this time.

[3]    References to audio files of court proceedings reflect the location of the cited portion of the audio file using hours, minutes and seconds.

[4]    Unless otherwise noted, all statutory citations refer to the Bankruptcy Code, Title 11, United States Code.

[5]    Bankruptcy Code § 522(d)(5) limits the wildcard exemption to a maximum of $13,100.00.  As the plaintiff also asserted the wildcard exemption to other property in the amount of $325.00, the available exemption regarding the Property was arguably only $12,775.00.

Financial Affairs, the plaintiff stated the defendants' claim arose from a Connecticut Superior Court judgment entered on October 23, 2014. ECF No. 1, pg. 41. The Chapter 7 Trustee filed a Report of No Distribution on April 14, 2017, indicating the estate was fully administered, and the Court entered a Chapter 7 discharge order on May 3, 2017. ECF No. 10.

On July 14, 2017, the plaintiff commenced this Adversary Proceeding by filing a complaint seeking to avoid the defendants' judicial lien that he claimed encumbered his § 522(d)(5) exemption. AP-ECF No. 1. The complaint asserted the defendants recorded a judgment lien against the Property on October 28, 2016, that the lien was "an involuntary transfer that the trustee could have but did not seek to avoid pursuant to [§] 547(b) and that the Plaintiff exempted the [Property] as an involuntary transfer pursuant to [§] 522(g)." The complaint further asserted the judgment lien was a "preferential transfer" under § 547(b), as the judgment lien was filed within ninety (90) days before the petition date and "enabled the Defendants to receive more in that the Judgment Lien was attached to an interest of the Plaintiff worth $16,885.00." AP-ECF No.1.

The defendants moved to dismiss the complaint, asserting (among other things) the plaintiff lacked standing, failed to state a claim for relief under § 522(g), was required to bring his assertions through a contested matter pursuant to Fed.R.Bankr.P. 4003 rather than by complaint pursuant to Fed.R.Bankr.P. 7001, and the complaint failed to state a claim for which relief could be granted pursuant to Fed.R.Civ.P. 12(b)(6) and Fed.R.Bankr.P. 7012. AP-ECF Nos. 6, 7.[6] The plaintiff clarified his legal theory to a

---

[6]     The Court notes on May 23, 2017, Mr. Tamis filed a Motion to Avoid Judicial Lien in the Main Case, alleging the same essential facts set forth in the complaint. ECF No. 13. However, he withdrew the motion on July 11, 2017. ECF No. 20. This motion is distinct from the Motion to Avoid Lien filed by Attorney Small in June 2018. ECF No. 22.

degree in his opposition to the motion to dismiss, and stated, "[§] 522(h) gives the debtor the right to avoid a transfer if the trustee does not attempt to avoid such transfer." AP-ECF No. 11.

The Court denied the motion to dismiss the complaint for several reasons, as set forth in AP-ECF No. 13. Familiarity with the ruling is assumed. Thereafter, during a status conference held on December 13, 2017, the parties expressed an interest in attempting to settle their disputes through mediation. A Mediation Referral Order entered referring the parties to mediation with another bankruptcy judge. AP-ECF No. 24. A mediation session was held on February 13, 2018, but no resolution was reached.

Findings of Fact After Evidentiary Hearing and Additional Procedural History

Based on the record of an evidentiary hearing held on April 9, 2019 (the "April 9th Hearing") to consider the Motion to Enforce, the record of this Adversary Proceeding and the Main Case including the record of various hearings, and, the testimony of witnesses and exhibits admitted during the April 9th Hearing, I find the following facts.

After the failure of the mediation effort in February 2018, counsel for plaintiff and the defendants continued to discuss the possibility of a settlement. On April 18, 2018, immediately before a status conference (the "April 2018 Status Conference"), Mr. Guedes, Mr. Tamis in his capacity as Mr. Guedes's attorney, and counsel for the defendants met outside the bankruptcy courtroom. Mr. Tamis later testified during the April 9th Hearing that "90%" of the settlement agreement was hashed out during this time. AP-ECF No. 77, p. 116. According to Mr. Tamis's testimony, Mr. Guedes verbally agreed to a settlement amount of $5,000.00 at that time, but the attorneys for both sides needed to work on the finer details of the payment schedule because the plaintiff needed time to pay the settlement amount. AP-ECF No. 77, pp. 116, 127.

4

During the April 2018 Status Conference, Mr. Tamis stated the parties had reached "tentative settlement" prior to the hearing, but the parties needed another status conference to iron out the details.  AP-ECF No. 32, 00:01:25 to 00:01:47.  Counsel for the defendants, however, stated that the parties were close to an agreement, but did not have "tentative settlement" yet since not all the terms had been worked out. [7]  AP-ECF No. 32, 00:01:55 to 00:02:20.  The status conference was continued to May 2, 2018, and the Court indicated to the parties that if they filed a motion to resolve the adversary proceeding through a settlement, on or before May 1, 2018, the Court would cancel the status conference.  AP-ECF No. 32, 00:03:55 to 00:04:34.

During the April 9th Hearing, Mr. Tamis testified that following the April 2018 Status Conference he negotiated a payment schedule over the course of several telephone calls with the defendants' attorney.  AP-ECF No. 77, pp. 116, 126-127.  He also testified that he relayed the status of the on-going negotiations to Mr. Guedes, who agreed to the terms of the payment schedule. AP-ECF No. 77, pp. 116, 126-127.  The defendants' attorney filed a motion to continue the May 2, 2018, status conference, with the consent of the plaintiff, because they were "attempting to work out the details of a potential settlement."  AP-ECF No. 33.  The April 2018 Status Conference was continued to May 23, 2018.  AP-ECF No. 34.

The day before the May 23rd status conference, Mr. Tamis filed a Motion to Resolve Adversary Proceeding by Settlement Agreement (the "Settlement Motion"), acting on behalf of the plaintiff.  AP-ECF No. 36.  The Court closed the Adversary

---

[7]    Mr. Guedes did not speak during the April 18th Status Conference, but he testified during the April 9th Hearing that after the status conference he told Mr. Tamis to not settle anything.  AP-ECF No. 77, pp. 62-63. In contrast, Mr. Tamis testified Mr. Guedes accepted the terms of the agreement and that he would have never asked the defendants' attorney to draft a written settlement agreement if Mr. Guedes did not agree.  AP-ECF No. 77, p. 119.

Proceeding on May 22, 2018.  Thereafter, the Adversary Proceeding was reopened, and the present Motion to Enforce was filed.

Evidence of an Unsigned, Written Settlement Agreement

According to Mr. Tamis's testimony, once the terms of the settlement agreement had been negotiated and agreed to by Mr. Tamis on behalf of Mr. Guedes, defendants' counsel prepared a written settlement agreement.  AP-ECF No. 77, pp. 121, 126;  EX. 503[8] (the "Unsigned Settlement Agreement").   The Unsigned Settlement Agreement stated Mr. Guedes would pay the defendants a total of $5,000.00 to resolve their differences.   EX. 503.   According to the Unsigned Settlement Agreement, an initial $1,000.00 payment would be made by a date certain with the remaining $4,000.00 to be paid in ten (10) monthly installments of $400.00 each.  EX. 503.

On May 23, 2018, Mr. Tamis sent a letter to the plaintiff, stating that, "I called today and spoke to [your assistant] who told me that you were away until Tuesday May 29, 2018.  I have worked out the [Unsigned] Settlement Agreement with [the defendants' attorney] and it is ready for signature.  Please call [my paralegal] on Wednesday morning May 30, 2018, and stop by the office to sign the agreement because it has to be notarized. . .Your first payment is due on June 1, 2018 in the amount of $1,000.00. Monthly payments of $400.00 are due beginning July 1, 2018."  Exhibit 102;  AP-ECF No. 77, p. 117-118.  Mr. Guedes read this letter and was aware of the general terms of the settlement agreement before his trip to Portugal on May 31, 2018.  AP-ECF No. 77,

---

[8]     Plaintiff's exhibits were numbered commencing with 101; defendants' exhibits were numbered commencing with 501.

pp. 89-91[9].

Mr. Tamis also testified that he sent the Unsigned Settlement Agreement via email to Mr. Guedes[10] on May 31, 2018, and requested that Mr. Guedes come to his office to sign it. Exhibit 103. Mr. Guedes testified that he first saw the Unsigned Settlement Agreement on June 7, 2019, when he returned from a trip to Portugal. AP-ECF No. 77, p. 69. On June 11, 2018, Mr. Guedes sent an email to Mr. Tamis stating,

> "I am waiting for a response to my inquiry from another attorney in order to be certain my only option is to pay $5,000 to [the defendants]. Two attorneys have already told me verbally that when a Discharge of Debtor is issued by the bankruptcy court it includes any lien that falls within the 90 day[11] filing. These were not bankruptcy experts but I have a call into someone that specializes. If it seems that I have no other option I will sign the settlement and proceed with the payments. As far I as I am concerned there is no deadline to sign the settlement."
> EX. 104.

On or before June 21, 2018, Mr. Guedes fired Mr. Tamis and hired Attorney Russell Small to represent him.[12] Attorney Small filed a second Motion to Avoid Lien pursuant to § 522(f) (the "Motion to Avoid Lien") in the Main Case on behalf of Mr.

---

[9]     Question:        Do you recall when you received this letter?
        Mr. Guedes:      I only received this letter June 8th when I got — June 7th actually when I got back from Europe.
        Question:        Okay. Was it the letter or the agreement that you didn't see until June 8th?
        Mr. Guedes:      Oh, I didn't see the agreement.
        Question:        What does the letter ask of you?
        Mr. Guedes:      The letter ask of me that I should go into Tamis's office and see Cindy on May 30, 2018, to sign and notarize an agreement?
        Question:        Did you ever do that?
        Mr. Guedes:      No, because I was out of the country the next day [May 31, 2018].

[10]    Mr. Guedes testified that he does not have his own email address and uses his wife's email instead. AP-ECF No. 77, p. 132-133. Mrs. Guedes called Mr. Tamis's law office and requested a copy of the settlement agreement. AP-ECF No. 77, pp. 132-133.

[11]    The Court notes that the difference between the date of the filing of the defendants' lien and the Petition Date is 84 days.

[12]    On June 21, 2018 Attorney Small filed a Motion to Avoid Lien in the main bankruptcy case. ECF No. 22. On September 26, 2018, Attorney Small filed Notices of Appearance in the Main Case and in this Adversary Proceeding. ECF No. 28; AP-ECF No. 40.

Guedes.  ECF No. 22.  The Motion to Avoid Lien alleged that the Property was worth $18,888.88, and alleged Mr. Guedes was entitled to claim an exemption of $13,100 pursuant to § 522(d)(5)[13].  The defendants objected to the Motion to Avoid Lien on the grounds that: (1) § 522(f) only avoids a lien to the extent that it impairs an exemption; (2) Mr. Guedes used his § 522(d)(5) exemptions on other property; and (3) the value of the Property was grossly understated.

The defendants filed the Motion to Enforce on February 8, 2019, along with a Motion to Dismiss the Adversary Proceeding. AP-ECF No. 57.  Because the Motion to Avoid Lien need not be heard until the Motion to Enforce was determined, the Court scheduled the April 9th Hearing.  During a hearing on February 13, 2019, Mr. Guedes agreed that he would appear to testify at the April 9th Hearing without the need for a subpoena.

The evening before the April 9th Hearing Attorney Small filed a motion to withdraw as counsel for Mr. Guedes, but that motion was later denied by the Court.  ECF Nos. 41 and 42; AP-ECF No. 73.  In the days and hours leading up to the April 9th Hearing, Mr. Guedes contacted the Clerk's Office several times indicating that he would not be attending the April 9th Hearing.[14]  Ultimately, Mr. Guedes appeared and testified during the April 9th Hearing.

---

[13]     The difference between the alleged value of the Property and the claimed exemption is $5,788.00. Even if the plaintiff was successful on the Motion to Avoid Lien and the full wildcard exemption amount were available, the Property would remain subject to a lien of at least $5,788.00.  While the Adversary Proceeding seeks to avoid the lien as a preferential transfer pursuant to § 547, that relief was not pursued by plaintiff.

[14]     The Court notes the email address Mr. Guedes used to contact the Clerk's Office reflected in AP-ECF No. 70 is the same email address Mr. Tamis testified he used to communicate with Mr. Guedes in 2018. Ex. 104.

## II.    APPLICABLE LAW AND BURDEN OF PROOF

Burden of Proof as to Whether the Attorney
Was Authorized to Agree on Behalf of the Client

The relationship between an attorney and client is one of agent and principal. *U.S. v. Int'l Bhd. of Teamsters*, 986 F.2d 15, 20 (2d Cir. 1993). In a case like this one, arising under federal law, "the scope of an agent's authority is determined according to federal precedent." *Int'l Bhd.*, 986 F.2d at 20.  The decision to settle a case belongs with the client.  *Int'l Bhd.*, 986 F.2d at 20-21.  The attorney, as an agent, may enter into contracts on behalf of and binding on the client if properly authorized.  *Int'l Bhd.*, 986 F.2d at 20-21.  A client can give proper authorization to an attorney by giving actual authority, which can be express or implied, or apparent authority.  *Int'l Bhd.*, 986 F.2d at 20-21.  Actual authority refers to communications between the principal and agent and "may be inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act."  *Int'l Bhd.*, 986 F.2d at 20 (quotation omitted). Apparent authority is "the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."  *Restat (Third) of Agency,* § 2.03 (2006); *see also Int'l Bhd.*, 986 F.2d at 20.

Due to the unique nature of the attorney-client relationship, and consistent with the public policy favoring settlements, this Circuit's Court of Appeals presumes, "that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so, [but] this presumption is rebuttable."  *Gomez v. City of New York*, 704 Fed.Appx. 25, 26 (2d Cir. 2017) (summary order) (quoting *Pereira v. Sonia*

9

*Holdings Ltd.* (*In re Artha Mgmt.*), 91 F.3d 326, 329 (2d Cir. 1996)). "In accordance with that presumption, any party challenging an attorney's authority to settle the case under such circumstances bears the burden of proving by affirmative evidence that the attorney lacked authority." *Pereira*, 91 F.3d at 329 (citing *Int'l Bhd.*, 986 F.2d at 20 (stating that the "burden of proving that an attorney entered into a settlement agreement without authority is not insubstantial")). Here, the plaintiff Mr. Guedes bears the burden of proof to present affirmative evidence establishing Mr. Tamis was not authorized to bind him to the terms of an oral settlement agreement.

<u>The Burden of Proof as to Whether an Enforceable Settlement Agreement Formed</u>

A settlement agreement pursuant to which parties agree to discontinue litigation constitutes a contract that, once entered, is both binding and conclusive[15]. *See, Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 444 (2d Cir. 2005) (holding that an agreement to settle litigation is a "contract that is interpreted according to general principles of contract law"). Actions to enforce settlement agreements are essentially state-law contract claims that are controlled by the forum state's substantive law. *See In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 134 (2d Cir. 2011); *see also In re Bear Stearns Companies, Inc. Sec., Derivative, & Erisa Litig*, 2014 U.S. Dist. LEXIS 131315 at *12, 2014 WL 4443458, at *5 (S.D.N.Y. Sept. 9, 2014); *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).

---

[15]     The Court of Appeals for the Second Circuit, "has not resolved the question of whether a district court should apply federal or state law to decide a motion to enforce a settlement, where the jurisdiction of the district court rests on a federal question." *Rahman v. Kaplan Cornelia, Inc.*, 2014 U.S. Dist. LEXIS 17449, at *13 n.4, 2014 WL 541851, at *4 (S.D.N.Y. Feb. 11, 2014)(citations omitted); *see, Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 322 (2d Cir. 1997)(finding that there is no material difference between New York state law or federal common law standards on this issue); *see also Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005)(stating that New York and Connecticut law are the same regarding enforcement of settlement agreements).

Under Connecticut law, a movant must prove the existence of a valid agreement by a preponderance of the evidence.  *See Omega Eng'g, Inc.*, 432 F.3d at 447.  "The existence of [a] contract is a question of fact to be determined by the trier on the basis of all the evidence. To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . If the minds of the parties have not truly met, no enforceable contract exists."  *Johnson v. Schmitz*, 237 F. Supp. 2d 183, 189 (D. Conn. 2002)(citations omitted).

While settlement agreements are typically reduced to writing, "parties are nevertheless free to enter into oral settlement agreements 'without memorializing their agreement in a fully executed document.'"  *In re Motors Liquidation Co.*, 580 B.R. 319, 343 (Bankr. S.D.N.Y. 2018)(quoting *Winston*, 777 F.2d at 80)).  "This freedom to contract orally remains even if the parties contemplate a writing to evidence their agreement. In such a case, the mere intention to commit the agreement to writing will not prevent contract formation prior to execution."  *Winston*, 777 F.2d at 80.

If a court finds that the parties entered into a "valid oral settlement agreement, the agreement is binding on the parties even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time it is reduced to writing, because when a party makes a deliberate, strategic choice to settle, a court cannot relieve him of that choice simply because his assessment of the consequences was incorrect."  *Motors Liquidation*, 580 B.R. at 343 (internal citations omitted); *see also Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007); *United States v. Bank of N.Y.*, 14 F.3d 756, 759 (2d Cir. 1994).

Parties may make preliminary oral settlement agreements with the intent that their agreement only becomes binding when reduced to writing and executed.  *See Motors*

11

*Liquidation*, 580 B.R. at 343; *see also Powell,* 497 F.3d at 129; *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 322 (2d Cir. 1997)).  "Because of th[e] freedom to determine the exact point at which an agreement becomes binding, a party can negotiate candidly, secure in the knowledge that he will not be bound until execution of what both parties consider to be final document."  *Winston*, 777 F.2d at 80.  An oral agreement of the material terms will be binding unless there is an express reservation made by any party not to be bound, in the absence of a written document executed by the parties. *See Brum v. Paragon Design Corp*, 18-CV-5399 (JMF), 2019 U.S. Dist. LEXIS 84802, at *11 (S.D.N.Y. May 15, 2019).

Oral settlement agreements can, "essentially be categorized into two buckets: (1) one in which the parties reached a preliminary agreement, contingent on and not intended to be binding absent formal documentation—and such an agreement is generally *not* enforceable, and (2) one in which there is already a binding oral agreement between the parties that is nevertheless to be further documented—and such an agreement is enforceable with or without formal documentation."  *Motors Liquidation*, 580 B.R. at 344 (citation and quotation marks omitted).

To determine whether a contract was formed, a court examines the intent of the parties, which can be discerned from the "words and deeds [of the parties] which constitute objective signs in a given set of circumstances."  *Winston*, 777 F.2d at 80; *see also Motors Liquidation*, 580 B.R. at 344 (stating the "key question before the court is whether there was a meeting of the minds of the parties both to the material terms of the settlement, and to be bound orally").  "The intention of the parties on this issue is a question of fact, to be determined by examination of the totality of the circumstances."  *Ciaramella*, 131 F.3d at 322.  Additionally, attorneys with actual or apparent authority

can bind their clients to oral settlements. *See Galanis v. Harmonie Club of N.Y.*, 2014 U.S. Dist. LEXIS 140591, 2014 WL 4928962 (S.D.N.Y. Oct. 2, 2014).

Courts in the Second Circuit consider four factors (the "Winston Factors") to determine whether parties intended to be bound by a settlement agreement without an executed written contract, as follows:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing;
> (2) whether there has been partial performance of the contract;
> (3) whether all of the terms of the alleged contract have been agreed upon; and
> (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston*, 777 F.2d at 80.  "No one *Winston* factor is decisive, and the analysis ultimately hinges on the parties' intent demonstrated through their objective communications and conduct." *Motors Liquidation*, 580 B.R. at 344 (citations omitted).

### III.    DISCUSSION

#### A.    Burdens of Proof

Here, Mr. Guedes, as the person questioning Mr. Tamis's authority to act on his behalf, must establish by a preponderance of the evidence – and must present affirmative evidence – that Mr. Tamis lacked actual or apparent authority to settle the case.   The defendants, as the parties seeking to enforce a purported settlement agreement, bear the burden of proving by a preponderance of the evidence that a binding and enforceable settlement agreement exists.

#### B.    Weighing the Evidence: Actual Authority to Settle for the Client

It is clear that after the mediation attempt failed in February 2018, the parties continued discussions in an attempt to resolve this Adversary Proceeding.  Mr. Tamis continued to discuss the parameters of a settlement agreement with counsel for the

defendants immediately prior to the April 2018 status conference, and thereafter, believing that he had actual authority to represent Mr. Guedes in resolving the Adversary Proceeding. AP-ECF No. 77, p. 106. Mr. Tamis's May 23rd letter to Mr. Guedes, Exhibit 102, reflects this belief by stating, "I have worked out the Settlement Agreement with [the defendants' attorney] and it is ready for signature." EX. 102. The May 31st reply email from Mr. Tamis to Mr. Guedes indicates that he continued to believe he had actual authority at that time. Ex. 103.

Mr. Guedes failed to present affirmative evidence showing that Mr. Tamis lacked the actual authority to settle the case on his behalf. Mr. Tamis testified that Mr. Guedes agreed to amount of the settlement ($5,000.00) before the April 2018 Status Conference and later agreed to the payment schedule. AP-ECF No. 77, pp. 109, 116. Other than Mr. Guedes's testimony, which was unpersuasive because it lacked specificity regarding dates and other details, and, because it appeared to contradict the evidence in the email correspondence, the plaintiff presented no evidence to support his contention that Mr. Tamis lacked actual or apparent authority to enter into a binding, oral settlement agreement.

During the April 9th evidentiary hearing, Mr. Guedes maintained that he did not see the Unsigned Settlement Agreement until June 7th, when he returned from Portugal. However, Mr. Guedes testified he read Mr. Tamis's May 23rd letter before departing on his trip on May 31st to Portugal, although he did not read the Unsigned Settlement Agreement until after his return from Portugal in June. The May 23rd letter outlined that a settlement agreement requiring payment of $5,000.00 had been reached with the defendants and detailed that Mr. Guedes must make an initial payment of $1,000.00 with

subsequent monthly payments of $400 to a specific payee at a specific mailing address. AP-ECF No. 77, pp. 89-91.

A reasonable person would have been alarmed by the May 23rd letter if he had not given his attorney authority to settle the case on his behalf. But, Mr. Guedes did not visit Mr. Tamis's office prior to his trip because he "was out of the country the next day" and instead Mrs. Guedes called Mr. Tamis's office on the morning of Mr. Guedes's trip to Portugal to simply request a copy of the Unsigned Settlement Agreement. AP-ECF No. 77, p. 132. May 30th or 31st would have been the time to object to the fact that the case had been wrongfully settled, but that objection came almost two weeks later on June 11th. *See Restat (Third) of Agency*, § 1.03 (2006) ("As between the agent and the principal, an unexplained failure to object may ... in appropriate circumstances constitute a manifestation of assent or intention.").

The June 11th email from the plaintiff to Mr. Tamis reflects a change of heart by Mr. Guedes, but not a repudiation of Mr. Tamis's actions up to that point. Mr. Guedes did not state he had not agreed to the terms of the settlement previously or that Mr. Tamis had overstepped his authority by agreeing to it. Rather, the email indicates the plaintiff had second thoughts about the terms of the settlement since he believed he may be able to avoid paying the $5,000.00 entirely.

Based on this record, Mr. Guedes did not meet his burden to establish with affirmative evidence that Mr. Tamis had no actual authority to enter into a binding agreement on his behalf.

C.    Weighing the Evidence: Apparent Authority to Settle for the Client

The evidence also supports a conclusion that Mr. Tamis had apparent authority to bind Mr. Guedes to the terms of the oral settlement agreement. Mr. Guedes was

present during the settlement discussions in April 2018, when the settlement amount of $5,000.00 was, or already had been, agreed.  According to Mr. Tamis, the plaintiff was also involved in the negotiations surrounding the payment plan for the $5,000.00 settlement amount.  AP-ECF No. 77, p. 107.

Mr. Tamis's actions indicated that he believed he had authority from the plaintiff to negotiate and agree to a settlement on his behalf.  First, Mr. Tamis represented during the April 2018 Status Conference hearing – with Mr. Guedes by his side – that a settlement had been reached.  Mr. Guedes did not disagree during or after the April 2018 Status Conference.  It was not until June 21, 2018, when Attorney Small filed a document on his behalf in the Main Case, that Mr. Tamis's apparent authority was affected by a filing with the Court.

Second, Mr. Tamis continued to negotiate the payment plan on behalf of Mr. Guedes during the period after the April 2018 Status Conference.  Had Mr. Guedes intended to revoke Mr. Tamis's apparent authority to speak for him, that intention was not communicated to the defendants or their attorney who continued to discuss settlement terms.

Third, Mr. Tamis testified that Mr. Guedes agreed during a phone conversation to the terms of the payment plan and, following through with his representation of Mr. Guedes, Mr. Tamis assisted in the drafting of the Unsigned Settlement Agreement and then filed the Settlement Motion.  *See*, AP-ECF No. 36.  Mr. Tamis's actions were consistent with an attorney having authority to negotiate a settlement agreement that was binding on his client.  No affirmative evidence of a lack of apparent authority was presented by the plaintiff.

16

D.    Conclusion Regarding Plaintiff's Burden of Proof

Because the plaintiff presented no plausible affirmative evidence that Mr. Tamis lacked authority to bind Mr. Guedes to the settlement terms during the relevant time period (April 18, 2018 through May 22, 2018), I conclude that Mr. Guedes has not met his burden of proof and that Mr. Tamis had both actual and apparent authority to bind Mr. Guedes to the settlement terms at the time of the filing on the Settlement Motion on May 22, 2018.

E.    Weighing the Evidence: Was there a Binding Settlement Agreement?

Having concluded that Mr. Tamis was authorized to act on behalf of the plaintiff, I turn to whether the movants met their burden to establish there was a binding, oral settlement agreement created between the parties.  During the April 2018 Status Conference hearing, Mr. Tamis, with the plaintiff by his side, indicated that the parties had reached a tentative settlement agreement.  However, the defendants disagreed and stated that terms of the settlement still needed to be worked out, making clear that any agreement would have been formed after that time.

The evidence presented by the movants, including testimony by Mr. Tamis, the Unsigned Settlement Agreement, and the email exchanges between Mr. Tamis and the plaintiff, tends to show that after the April 2018 Status Conference, a payment plan was negotiated between the attorneys, and the plaintiff thereafter agreed to the terms, although his agreement was oral.  AP-ECF No. 77, p. 108.  This conclusion is supported by the lack of any evidence that the plaintiff rejected the settlement terms at the time, or any time thereafter.

Instead, the evidence presented by the movants demonstrates that the plaintiff had second thoughts about the agreement based on conversations with other attorneys

about his options.  The plaintiff's email stated that he was seeking an additional opinion from a bankruptcy expert, and, "[i]f it seems that I have no other option I will sign the settlement and proceed with the payments." Ex. 104.  But Mr. Guedes's email does not repudiate the terms of the agreement or indicate that his attorney had overstepped his authority by agreeing to any of its terms.  A valid oral settlement agreement will be "binding on the parties even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time it is reduced to writing, because when a party makes a deliberate, strategic choice to settle, a court cannot relieve him of that choice simply because his assessment of the consequences was incorrect." *Motors Liquidation*, 580 B.R. at 343 (internal citations omitted); *see also Powell*, 497 F.3d at 128; *Bank of N.Y.*, 14 F.3d at 759.

Based on the record here, I conclude that the evidence presented by the defendants during the April 9th evidentiary hearing was sufficient to meet their burden of proof to establish there was an oral agreement between the parties to settle their disputes.

### E.    Existence of an Enforceable Oral Agreement to Settle

Turning to whether the oral agreement was enforceable, after consideration of the four *Winston* factors, I conclude that it was.  None of the parties nor their attorneys signed the Unsigned Settlement Agreement, so this Court must decide whether the parties meant to be bound at the time they agreed to settlement terms but before a written settlement agreement was signed.  "Courts in the Second Circuit consider four factors articulated in *Winston* to determine whether the parties intended to be bound to a settlement agreement without an executed written contract." *Motors Liquidation*, 580 B.R. at 344.

18

1.    *Reservation Not To be Bound*

The first *Winston* factor examines whether either party communicated an intent not to be bound until there is a fully executed document.  *See Winston*, 777 F.2d at 80. Here, it is clear that Mr. Tamis and counsel for the defendants reached an oral settlement agreement and agreed it would be documented by a written settlement agreement.  Mr. Tamis testified that Mr. Guedes was regularly informed of the status of the terms of the settlement and orally agreed to the material terms.  AP-ECF No. 77, p. 109.  Mr. Tamis's May 22nd filing of the Settlement Motion on behalf of the plaintiff indicates that an agreement was reached by that date, without any reservation that the settlement agreement be in writing or be signed.  As discussed several times already, the evidence supports the conclusion that Mr. Tamis was authorized to agree and did agree on behalf of the plaintiff to all of the settlement terms, at least by May 22, 2018.

Accordingly, because the evidence supports the conclusion there was no reservation by the parties to be bound only if and when a written agreement had been signed, I conclude the first *Winston* factor weighs in favor of the enforcement of the oral agreement.

2.    *Partial Performance*

The second *Winston* factor considers whether a party, "has partially performed, and that performance has been accepted by the party disclaiming the existence of an agreement." *Ciaramella*, 131 F.3d at 325 (citation omitted).   "The absence of partial performance weighs against enforcing the settlement."  *Motors Liquidation*, 580 B.R. at 346 (citing *Cartier Int'l, N.V. v. QVC, Inc.*, 677 F. Supp. 2d 712, 716 (S.D.N.Y. 2009) (finding that there was no partial performance under the purported settlement because the defendants did not make any payments to the plaintiff)).   "Partial performance

requires some actual performance of the contract. ... [One party] must have conferred something of value upon [the other party] which [was] accepted." *P.A. Bergner & Co. v. Martinez*, 823 F. Supp. 151, 157 (S.D.N.Y. 1993).  "Thus, for example, in *Lehman*, a bankruptcy court found there was no partial performance because the benefits of the settlement at issue were 'a release from litigation in exchange for payment,' and no money had been paid and no release had been signed.*" Motors Liquidation*, 580 B.R. at 346 (citing *In re Lehman Bros. Holdings Inc.*, 2012 U.S. Dist. LEXIS 51959, 2012 WL 1057952, at *3 (S.D.N.Y. Mar. 26, 2012)).

Here, there was partial performance of the terms of the oral agreement when Mr. Tamis filed the Settlement Motion on May 22nd.  One of the requirements of the oral agreement, and consistent with paragraph 7 of the Unsigned Settlement Agreement, was for Mr. Guedes to "file the appropriate documents to have the docket and court record in the action appropriately marked off to reflect the dismissal, with prejudice, of all the claims."  Thus, there was partial performance of the agreement.

The evidence supports weighing the second *Winston* factor in favor of enforcement of the oral agreement.

### 3.    *Agreement on All of the Terms*

The third *Winston* factor favors enforcement when there is "literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to."  *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 76 (2d Cir. 1984).  "The court in *Winston* emphasized that because '[t]he actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission, which must be worked out prior to execution,' minor or technical changes made to a written

document subsequent to parties' oral agreement could weigh against finding a binding contract." *Motors Liquidation*, 580 B.R. at 347 (citing *Winston*, 777 F.2d at 82).

Here, the parties reached "90%" of the terms of the settlement during settlement discussions involving Mr. Guedes before the April 18th status conference hearing.  After the status conference hearing and before the May 22nd filing of the Settlement Motion, all the remaining terms were agreed.

Accordingly, because the evidence supports the conclusion that all terms of the settlement agreement were agreed prior to the May 22nd filing of the Settlement Motion, the third *Winston* factor supports enforcement of the oral agreement.

4.    *Agreement Usually Committed to Writing*

The fourth and final *Winston* factor looks to whether the parties' purported agreement is one that is usually in writing.  "Settlements are generally made in writing or, at a minimum, made on the record in open court."  *Motors Liquidation*, 580 B.R. at 347 (citing *Powell*, 497 F.3d at 131).

The last *Winston* factor weighs in favor of enforcing the agreement where an agreement that is typically reduced to writing, is in fact reduced to writing, although unexecuted.  *See Motors Liquidation*, 580 B.R. at 363.  Some courts have disregarded the fourth prong of the *Winston* balancing test when the terms of an oral settlement agreement are drafted and transmitted between parties.  *See Goldstein v. Solucorp Indus.*, 2017 U.S. Dist. LEXIS 20294, at *21-22, 2017 WL 1078739, at *9 (S.D.N.Y. Feb. 10, 2017); *Conway v. Brooklyn Union Gas Co.*, 236 F. Supp. 2d 241, 251-52 (E.D.N.Y. 2002) ("Here, even if the agreement is the type that is typically reduced to writing, the written draft of the settlement had essentially been finalized . . . . The terms, with the exception of the final dollar amounts, were 'substantially complete' and 'largely reduced

to writing.' Moreover, the parties had confirmed to the court, as part of the process of negotiating the monetary amount, that their agreement on a sum would settle the case.") (citations omitted); *Krauth v. Exec. Telecard, Ltd.*, 890 F. Supp. 269, 295 (S.D.N.Y. 1995) ("The fourth factor is not particularly meaningful in this context, the agreements are in a writing.")

In this case, there was an oral settlement agreement on all material terms that was then memorialized in the Unsigned Settlement Agreement, and that in turn was agreed to by Mr. Tamis and the defendants' attorney. Based on this record, I conclude the final *Winston* factor weighs in favor of enforcement of the oral settlement agreement, even though the Unsigned Settlement Agreement remained unexecuted.

## IV.    CONCLUSION

For these reasons, I conclude that the plaintiff failed to establish that Mr. Tamis lacked actual or apparent authority when he negotiated the terms for a settlement agreement. I further conclude that the movants established that the oral settlement agreement was complete with no necessary term left to be agreed upon, and under *Winston,* it is enforceable.

**ACCORDINGLY,** it is hereby

**ORDERED:**  That, the Motion to Enforce is GRANTED; and it is further

**ORDERED:**  That, the plaintiff Moises Guedes shall pay the defendants Raymond and Florence DiGiorgio a total of $5,000.00, with payments as follows:

(1) The sum of $1,000.00 on or before August 1, 2019; and,

(2) The sum of $400.00 on September 1, 2019, and on the first day of each month thereafter until the remaining $4,000.00 has been paid.

And it is further

**ORDERED:** That, the Clerk shall close this Adversary Proceeding.

Dated on July 2, 2019, at New Haven, Connecticut.

Ann M. Nevins
United States Bankruptcy Judge
District of Connecticut